**UNITED STATES  DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **WILTON CARRABY** | **CIVIL ACTION** |
| **versus** | **NO. 13-3268** |
| **N. BURL CAIN** | **SECTION: "F" (1)** |

**REPORT AND RECOMMENDATION**

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Wilton Carraby,[1] is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.  On February 23, 2005, he was convicted of second degree murder under Louisiana law.[2]  On June 22, 2006, he was sentenced to a term of life imprisonment

---

[1] Petitioner's surname appears in the record as both "Carraby" and "Caraby."

[2] State Rec., Vol. III of IV, transcript of February 23, 2005, p. 129; State Rec., Vol. I of IV, minute entry dated February 23, 2005; State Rec., Vol. I of IV, jury verdict form.

without benefit of probation, parole, or suspension of sentence.[3]  On March 21, 2007, the Louisiana

Fourth Circuit Court of Appeal affirmed his conviction and sentence.[4]  The Louisiana Supreme

Court denied his related writ application on February 15, 2008.[5]

   On or about February 9, 2010, petitioner filed an application for post-conviction relief

with the state district court.[6]  That application was denied on March 16, 2010.[7]  His related writ

applications were then likewise denied by the Louisiana Fourth Circuit Court of Appeal on May 11,

2010,[8] and by the Louisiana Supreme Court on June 24, 2011.[9]

---

[3] State Rec., Vol. III of IV, transcript of June 22, 2006; State Rec., Vol. I of IV, minute entry dated June 22, 2006.

[4] State v. Caraby, No. 2006-KA-1376, 2007 WL 7711284 (La. App. 4th Cir. Mar. 21, 2007); State Rec., Vol. I of IV.

[5] State ex rel. Caraby v. State, 976 So.2d 169 (La. 2008) (No. 2007-KH-0968); State Rec., Vol. I of IV.

[6] Although the filing date of that application is not reflected in the record, petitioner alleged in a related writ application that the post-conviction application was filed on February 9, 2010.  See State Rec., Vol. II of IV.  For the purposes of this opinion, the undersigned will accept that allegation as true.

[7] State Rec., Vol. I of IV, Judgment dated March 16, 2010.

[8] State v. Caraby, No. 2010-K-0560 (La. App. 4th Cir. May 11, 2010); State Rec., Vol. I of IV.

[9] State ex rel. Caraby v. State, 64 So.3d 207 (La. 2011) (No. 2010-KH-1396); State Rec., Vol. I of IV.

On August 2, 2012, petitioner filed another application for post-conviction relief with the state district court.[10]  That application was denied on August 24, 2012.[11]  His related writ applications were likewise denied by the Louisiana Fourth Circuit Court of Appeal on October 4, 2012,[12] and by the Louisiana Supreme Court on April 1, 2013.[13]

On or about April 9, 2013, petitioner filed the instant federal application seeking *habeas corpus* relief on the grounds that the prosecution suppressed evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny.[14]  The state filed an initial response in opposition which addressed only the timeliness of petitioner's application;[15] however, the Court then ordered the state to file a supplemental response addressing the merits of petitioner's claim and any other

---

[10]  State Rec., Vol. I of IV.  Petitioner states that he filed the application on August 2, 2012, Rec. Doc. 1, p. 33, and the state does not dispute that assertion, Rec. Doc. 4, p. 6.

[11]  State Rec., Vol. I of IV, Judgment dated August 24, 2012.

[12]  <u>State v. Caraby</u>, No. 2012-K-1393 (La. App. 4th Cir. Oct. 4, 2012); State Rec., Vol. I of IV.

[13]  <u>Caraby v. State</u>, 110 So.3d 576 (La. 2013) (No. 2012-KH-2400); State Rec., Vol. I of IV.

[14]  Rec. Doc. 1.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  <u>Roberts v. Cockrell</u>, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  The record does not reflect when that occurred in this case; however, petitioner signed the application on April 9, 2013, and, in the absence of any other evidence on this point, the Court will assume for the purposes of this decision that it was delivered to prison officials for mailing on that same date.

[15]  Rec. Doc. 4.

- 3 -

defenses it wished to raise.[16]  The state thereafter filed a supplemental response,[17] and petitioner filed

a reply to that response.[18]

<u>I.  Timeliness</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established

a one-year statute of limitations for the filing of federal *habeas corpus* applications.  The method

for calculating a petitioner's one-year period is set forth in 28 U.S.C. § 2244(d), which provides:

> (1) A 1-year period of limitation shall apply to an application
> for a writ of habeas corpus by a person in custody pursuant to the
> judgment of a State court.  The limitation period shall run from the
> latest of –
>
>> (A) the date on which the judgment became final by
>> the conclusion of direct review or the expiration of the time
>> for seeking such review;
>> (B) the date on which the impediment to filing an
>> application created by State action in violation of the
>> Constitution or laws of the United States is removed, if the
>> applicant was prevented from filing by such State action;
>> (C) the date on which the constitutional right asserted
>> was initially recognized by the Supreme Court, if the right
>> has been newly recognized by the Supreme Court and made
>> retroactively applicable to cases on collateral review; or
>> (D) the date on which the factual predicate of the
>> claim or claims presented could have been discovered
>> through the exercise of due diligence.

In its original response in this federal proceeding, the state argued that petitioner's

federal application was untimely under § 2244(d)(1)(A).  While that would be accurate, it also is not

---

[16]  Rec. Doc. 5.

[17]  Rec. Doc. 20.

[18]  Rec. Doc. 21.

at issue – petitioner does not argue that his application is timely under that provision.  Rather, he argues that § 2244(d)(1)(D) is applicable here and that his application is timely under that provision.[19]  In its supplemental response, the state argues that petitioner's application is likewise untimely under that provision.[20]  For the following reasons, the undersigned disagrees with the state's argument and finds that the application is in fact timely.

The factual predicates of petitioner's claim in this proceeding are police reports he discovered upon obtaining a copy of the District Attorney's file.  Under Louisiana law, he was not entitled to obtain a copy of that file until his criminal conviction became final in 2008.  Lemmon v. Connick, 590 So.2d 574 (La. 1991); see also Wallace v. Ware, 657 So.2d 734, 736-37 (La. App. 1st Cir. 1995); Voelker v. Miller, 613 So.2d 1143 (La. App. 5th Cir. 1993).  No later than August 8, 2008, he diligently began requesting a copy of his file from the District Attorney's Office.[21]  He

---

[19]  Rec. Doc. 1, pp. 31-34.

[20]  In its supplemental response, the state separates its discussion of timeliness in two parts, one addressing what it calls petitioner's "marijuana and race claims" and one addressing what it calls his "numbers and timing claims."  See Rec. Doc. 20, pp. 5-10.  However, in his reply to the state's response, petitioner makes clear that he is not in fact asserting "numbers and timing claims," stating: "The District Attorney also erroneously states that petitioner could have discovered the factual predicate of what he has elected to call petitioner's timing and numbering claim.  This is surely a mistake, because petitioner did not raise such a claim in any of his petitions."  Rec. Doc. 21, p. 3 (footnote omitted).  Accordingly, this decision is restricted to analyzing the timeliness and merits of the "marijuana and race claims."

[21]  Rec. Doc. 1-1, p. 54.

alleges that he finally received a response in July of 2011 informing him of the cost, and he then immediately took action to purchase the records.[22]  He received the records on August 11, 2011.[23]

This Court has no reason to doubt the veracity of petitioner's contentions regarding the foregoing efforts to procure the District Attorney's file, and the state does not contest his allegations on this issue.[24]  Therefore, this Court concludes that "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence" was the date on which he actually received the District Attorney's file after his diligent efforts:  August 11, 2011.  Accordingly, pursuant to § 2244(d)(1)(D), his federal limitations period commenced on that date and then expired one year later, unless that deadline was extended through tolling.

The Court first considers statutory tolling.  Regarding the statute of limitations, the AEDPA expressly provides:  "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).

After three hundred fifty-six (356) days elapsed, petitioner tolled his federal limitations period by filing a post-conviction application with the state district court on August 2, 2012.  Tolling then continued uninterrupted for the duration of the post-conviction proceedings, so long as he sought supervisory review in a timely manner.  <u>Grillette v. Warden, Winn Correctional</u>

---

[22]  Rec. Doc. 1, pp. 33-34; Rec. Doc. 1-1, p. 60.

[23]  Rec. Doc. 1, pp. 33-34.

[24]  Rec. Doc. 20, p. 6.

Center, 372 F.3d 765, 769-71 (5th Cir. 2004).  The record indicates that petitioner's related appellate writs were timely filed, and state concedes that point.[25]   Therefore, tolling continued until the Louisiana Supreme Court denied relief on April 1, 2013.[26]

        At that point, petitioner had nine (9) days of the federal limitations period remaining. Because he filed his federal application eight (8) days later on April 9, 2013, it was timely filed.[27]

        Because the application is timely, and because the state has raised no other procedural defenses, the undersigned will address petitioner's claim on the merits.

---

[25]  Rec. Doc. 20, p. 9.

[26]  A petitioner receives no additional tolling credit for the period during which he could have sought review by the United States Supreme Court with respect to the denial of post-conviction relief.  Lawrence v. Florida, 549 U.S. 327, 332 (2007); Ott v. Johnson, 192 F.3d 510, 512-13 (5th Cir. 1999).

[27]  In its supplemental response, the state argues that petitioner's federal application was filed one day too late.  However, that argument is based on a calculation error.  Specifically, the state argues that three hundred fifty-*eight* (35*8*) days elapsed before the limitations period was tolled by the post-conviction filing.  In that calculation, the state appears to have counted against petitioner both August 11, 2011, the date on which he received the file, and August 2, 2012, the date he filed his post-conviction application.  See Rec. Doc. 20, p. 9.  However, neither of those days counts against him.  The date on which he received the file  (i.e. the date the factual predicate was discovered) is excluded from the period pursuant to Fed. R. Civ. P. 6(a)(1), which provides:  "When the period is stated in days or a longer period of time[,] exclude the day of the event that triggers the period."  See also Wilson v. Beard, 426 F.3d 653, 662 (3rd Cir. 2005) ("Moreover, common sense dictates that the date on which the factual predicate occurs not count as part of the one-year limitations period.").  Additionally, the date on which he filed his state post-conviction application is likewise excluded from the one-year limitations period because that day was *tolled* pursuant to § 2244(d)(2).  See, e.g., Windland v. Quarterman, 578 F.3d 314, 317 (5th Cir. 2009) ("Applying the plain language of the statute, we hold that a state petition for habeas relief is 'pending' for AEDPA tolling purposes *on the day it is filed* through (and including) the day it is resolved." (emphasis added)).  When those two days are properly excluded from the one-year period, it is clear that petitioner's federal application was filed one day before the deadline expired, not one day after.

## II.  Petitioner's Claim

In his federal application, petitioner claims that the prosecution suppressed evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny.  In the state post-conviction proceedings, the state district court simply denied that <u>Brady</u> claim "on the showing made" without further analysis.[28]  His related writ applications were then likewise denied, without additional reasons assigned, by the Louisiana Fourth Circuit Court of Appeal[29] and the Louisiana Supreme Court.[30]

Despite the dearth of reasoning in those decisions, it is presumed that the state courts denied petitioner's claim on the merits.  <u>See</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").  In light of that presumption and the fact that a <u>Brady</u> claim presents a mixed question of law and fact, federal *habeas* relief is available only if petitioner shows that the state court decision was "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); <u>Dilosa v. Cain</u>, 279 F.3d 259, 262 & n.2 (5th Cir. 2002).

---

[28]  State Rec., Vol. I of IV, Judgment dated August 24, 2012.

[29]  <u>State v. Caraby</u>, No. 2012-K-1393 (La. App. 4th Cir. Oct. 4, 2012); State Rec., Vol. I of IV.

[30]  <u>Caraby v. State</u>, 110 So.3d 576 (La. 2013) (No. 2012-KH-2400); State Rec., Vol. I of IV.

There is no basis for concluding that the state court decision was "contrary to" clearly established federal law.  Regarding the "contrary to" clause of § 2254(d)(1), the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).  Although the state courts in this case did not cite to Brady in adjudicating petitioner's claim, that fact is immaterial when considering the "contrary to" clause of § 2254(d)(1).  See, e.g., Mitchell v. Esparza, 540 U.S. 12, 16 (2003) ("A state court's decision is not contrary to clearly established Federal law simply because the court did not cite our opinions.  We have held that a state court need not even be aware of our precedents, so long as neither the reasoning nor the result of the state-court decision contradicts them." (citations, quotation marks, and ellipsis omitted)).  Simply put:  where, as here, there is (1) no indication that the state court applied a legal standard that contradicted Brady's holding and (2) no Supreme Court case with "materially indistinguishable" facts, a petitioner can be granted relief only by showing that the state court decision was an "unreasonable application" of clearly established federal law.  See Price v. Vincent, 538 U.S. 634, 640 (2003).

Regarding the "unreasonable application" clause of § 2254(d)(1), the United States Supreme Court has held:  "[A] state-court decision is an unreasonable application of our clearly

established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

In trying to establish that the state court's decision was unreasonable, petitioner therefore faces several daunting obstacles. First, it is not enough for him to show that the state court's decision was simply incorrect. The Supreme Court has expressly cautioned that "an unreasonable application is different from an incorrect one." Bell v. Cone, 535 U.S. 685, 694 (2002). Accordingly, a state court's merely incorrect application of Supreme Court precedent does not warrant *habeas* relief. Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

Second, petitioner is not entitled to relief if there is *any* possible argument or theory that *could have* served as a reasonable basis for the state court's denial of his claim.  As the United States Supreme Court has explained:

> Under § 2254(d), a habeas court must determine what arguments or theories supported or ... *could have supported* ... the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

Harrington v. Richter, 562 U.S. 86, 102 (2011).

Third, as explained below, the instant case turns on whether the withheld evidence was "material."  The deference to which the state court decision is entitled is therefore heightened due to the generality of the materiality standard.  As the United States Fifth Circuit Court of Appeals has explained:

> [T]he materiality standard is a general rule, meaning a wide range of reasonable applications exist.  See Yarborough [v. Alvarado,], 541 U.S. [652,] 664, 124 S.Ct. 2140 [(2004)] ("The more general the rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations.").

Cobb v. Thaler, 682 F.3d 364, 381 (5th Cir. 2012).

With the foregoing principles in mind, the undersigned will now turn to the merits of petitioner's Brady claim.  Regarding such claims, the United States Supreme Court has explained:

> The right to a fair trial, guaranteed to state criminal defendants by the Due Process Clause of the Fourteenth Amendment, imposes on States certain duties consistent with their sovereign obligation to ensure that justice shall be done in all criminal prosecutions.  In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), we held that when a State *suppresses* evidence *favorable to an accused* that is *material* to guilt or to punishment, the

> State violates the defendant's right to due process, irrespective of the
> good faith or bad faith of the prosecution.

Cone v. Bell, 556 U.S. 449, 451 (2009) (emphasis added; citations and quotation marks omitted).

Accordingly, to prevail on a Brady claim, a petitioner must prove three elements: "(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to his guilt or punishment." Mahler v. Kaylo, 537 F.3d 494, 500 (5th Cir. 2008).

In its supplemental response in this federal proceeding, the state focuses exclusively on the materiality prong of the Brady analysis, apparently conceding the first two prongs. This Court will therefore likewise focus its analysis on the materiality prong.

Of the three prongs of the Brady analysis, the materiality prong "is generally the most difficult to prove." Mahler, 537 F.3d at 500. "The materiality of Brady material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state." Smith v. Black, 904 F.2d 950, 967 (5th Cir. 1990), vacated on other grounds, 503 U.S. 930 (1992); accord LaCaze v. Warden Louisiana Correctional Institute for Women, 645 F.3d 728, 736 (5th Cir. 2011). Accordingly, the Court will first consider the other evidence in the instant case.

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the evidence in this case as follows:

> On the evening of May 18, 2004, New Orleans Police Officer Jason Lewis ("Officer Lewis") responded to a call of aggravated battery by shooting at 2712 St. Bernard Avenue. When he arrived on the scene, residents of the area told him to go into the garage, which was situated behind the residence. Officer Lewis went into the garage, which had been made into a recreational room ("rec room"), and discovered a black male lying on the floor bleeding from his back. While other officers tended to the victim, Purnell Brown ("Mr. Brown"), Officer Lewis preserved the crime scene.

Detective Joe Trippodo ("Detective Trippodo"), the lead homicide detective, spoke with the only witness, Troy Lee ("Mr. Lee"), who was agitated and upset.  Mr. Lee told Detective Trippodo that he and Mr. Brown were playing a video game in the garage when three men came into the room.  One of the men ordered him to lie on the ground at gunpoint, another stood near him, and the third took Mr. Brown outside.  Mr. Lee stated that two men were African-American and one was Caucasian.  He did not recognize the perpetrators.  However, Mr. Lee gave descriptions of two of the men. He stated that the man who pointed a gun at his head was Caucasian, in his early twenties, tall, thin, and had short hair.  The African-American male who told the Caucasian male to get him on the floor was in his early twenties, shorter than the Caucasian male, and had a low haircut.  The other African-American male stayed outside with Mr. Brown, and Mr. Lee could not see him.  Mr. Lee was initially charged with possession of the marijuana found on the premises.

Detective Trippodo obtained the names of two possible suspects, Ray Arizi ("Mr. Arizi") and Wilton Caraby ("Defendant Caraby"), from the descriptions provided by Mr. Lee.  Detective Trippodo contacted Mr. Lee who stated that he did not want to get involved.  He was fearful and afraid for his family's safety and his job.  Detective Trippodo asked Mr. Lee to reconsider.  Later, Detective Trippodo met with Mr. Lee and presented him with a photographic lineup.  Detective Trippodo asked Mr. Lee if he recognized anyone.  Mr. Lee identified Mr. Arizi as the Caucasian male and defendant Defendant Caraby as the African-American male who told Mr. Arizi to put Mr. Lee on the ground.  Detective Trippodo did not coerce or promise Mr. Lee anything for the identification. Detective Trippodo stated that Mr. Lee was coherent at the time of the photographic lineup.

Mr. Lee testified that he gave a description of the perpetrators to the police.  He stated that there were two African-American men and one Caucasian man.  One African-American man stayed outside with Mr. Brown, and Mr. Lee could not see him well enough to give a description.  The other two men came into the rec room, which had sufficient lighting, and he could see them well.  The African-American was dark-skinned, short and had low cut hair, almost bald. The Caucasian was taller than the African-American, and also had a short haircut.

Mr. Lee spoke with Detective Trippodo about a week after the shooting.  He told Detective Trippodo that he did not want to be involved.  He had been arrested for something that did not belong to

him, and he felt unsafe.  A few days later, Detective Trippodo met
Mr. Lee at Mr. Lee's grandmother's house.  Detective Trippodo
showed him some photographic lineups.  Mr. Lee identified
Defendant Caraby and Mr. Arizi.

Dr. Samantha Huber ("Dr. Huber"), a forensic pathologist,
performed an autopsy on the victim, Mr. Brown.  Dr. Huber testified
that Mr. Brown died from bleeding out due to six gunshot wounds to
the back.[31]

In support of his <u>Brady</u> claim, petitioner points to three police reports that were

withheld from the defense.  In the first document, a "Major Offense Report Form" dated May 18,

2014, Detective Chris Martin stated:

The victim stated, on Tuesday, May 18, 2004, at about 11:50 p.m.,
three unknown black males forced him into the side entrance of his
residence at 2712 St. Bernard avenue.  After they were inside the
residence, the unknown subjects shot him in the back several times
and fled the residence.  It is unknown who the subjects are and why
they shot him.[32]

The second document, a "Major Offense Report Form/Homicide Section" dated May

21, 2004, states:

On 5-18-04 at approximately 10:30 pm the victim, Purnell Brown and
a friend (Troy Lee) were smoking marijuana and playing X-box in a
converted garage behind the residence when three men (Two black
males and one white male) entered the garage and the white male
stepped outside with the victim, 1-3 minutes later Troy Lee reported
hearing 4-6 gunshots and the 2 black males fled and Purnell ran into
his house and collapsed.  The victim was struck 5 times, all in the

---

[31]  <u>State v. Caraby</u>, No. 2006-KA-1376, 2007 WL 7711284, at *1-2 (La. App. 4th Cir. Mar. 21,
2007); State Rec., Vol. I of IV.

[32]  Rec. Doc. 1-1, p. 26-28.

abdoman [sic], he was transported to Charity and was pronounced at approximately midnight.  Several leads are being followed up on.[33]

The third document, a "Major Offense Report Form/Homicide Section" dated May 28, 2004, repeated the foregoing paragraph from the May 21 report verbatim.[34]

Petitioner argues that these three reports were material because they could have been used to challenge the accuracy and veracity of the testimony of the state's witnesses at trial. Specifically, he notes:  (1) Martin's report states that Brown reported that all three perpetrators were black, whereas Lee testified at trial that two were black and one was white;[35] and (2) the two remaining reports state that Lee had been smoking marijuana prior to the incident, whereas Lee testified at trial that he did not smoke marijuana[36] and Trippodo testified that Lee did not appear to be "high"[37] or smell of marijuana.[38]

Essentially, petitioner's argument is this:  The *only* evidence directly connecting him to the crime was the eyewitness testimony of Troy Lee; therefore, the prosecution's case would succeed or fail based entirely on whether the jurors believed Lee.  As a result, evidence relevant to

---

[33] Rec. Doc. 1-1, p. 29.  Although Detective Trippodo's name appears on both this and the third report as the detective assigned to the case, it is unclear whether he authored the reports.

[34] Rec. Doc. 1-1, p. 30.

[35] See State Rec., Vol. III of IV, transcript of February 23, 2005, pp. 83 and 87.  Out of an abundance of caution, the undersigned again notes that petitioner is an African American. Therefore, the relevance of this information to petitioner is limited to a suggestion that Lee's credibility and the accuracy of his memory of the events is suspect in light of the discrepancy.

[36] State Rec., Vol. III of IV, transcript of February 23, 2005, p. 79.

[37] State Rec., Vol. III of IV, transcript of February 23, 2005, pp. 43-44.

[38] State Rec., Vol. III of IV, transcript of February 23, 2005, pp. 56.

whether Lee was accurately remembering and truthfully recounting the events of the night of the murder was crucial to the defense.  It can hardly be doubted that withheld evidence is in fact more likely to be material if it "would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration."  LaCaze v. Warden Louisiana Correctional Institute for Women, 645 F.3d 728, 736 (5th Cir. 2011); United States v. Weintraub, 871 F.2d 1257, 1262 (5th Cir. 1989).

Here, petitioner argues that the withheld police reports contain information that undermines Lee's credibility and/or the accuracy of his observations and memories of the events. Specifically, petitioner suggests that the information that Lee had been smoking marijuana would have aided the defense in two respects.  First, it would have rendered Lee's credibility suspect because his job as a postal employee might be endangered if he was involved with marijuana – therefore, he had a motive to lie for the state in order to avoid being prosecuted for a drug crime. Second, if Lee was impaired by marijuana, the reliability of his identification of petitioner and his memory of the events would be arguably suspect, especially when the marijuana use is further coupled with the information in Detective Martin's withheld report indicating that the victim stated that all of the perpetrators were black (contrary to Lee's recollection that one was white).

The state counters that petitioner overstates the importance of the reference to marijuana use in the reports.  The state notes that the trial featured extensive testimony, including that of Lee himself, concerning the fact that marijuana was present on the scene.  The state therefore notes that the only additional useful information from the reports that is even arguably useful to the defense was the statement that "Purnell Brown and a friend (Troy Lee) *were smoking* marijuana."

(emphasis added). However, the state downplays the importance of the reference in light of its vagueness, arguing:

> [T]he Homicide Report Form does not provide a source for its notation that both Lee and Brown were smoking marijuana prior to the shooting. There is certainly no indication that either Lee or Brown made such an admission. Rather, it is just as reasonable, based on the fact that marijuana was found on the crime scene and that the recreational shed, according to Detective Trippodo's trial testimony, smelled strongly of marijuana, that the author of the Homicide Report Form simply *assumed* that Lee and Brown had been using marijuana.[39]

For the following reasons, the undersigned finds that petitioner has not met the high burden necessary to establish that the withheld reports were material. On that issue, it must be remembered that the mere fact that the reports might have been *helpful* to the defense does not render them *material*. See, e.g., United States v. Agurs, 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense ... does not establish 'materiality' in the constitutional sense."). Rather, as the Supreme Court has explained:

> In United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (opinion of Blackmun, J.), we explained that evidence is "material" within the meaning of Brady when there is a *reasonable probability* that, had the evidence been disclosed, *the result of the proceeding would have been different*. In other words, favorable evidence is subject to constitutionally mandated disclosure when it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

Cone v. Bell, 556 U.S. 449, 469-70 (2009) (emphasis added).

The undersigned is unpersuaded by petitioner's argument that the reports' references to marijuana were material because they show that Lee testified in an attempt to curry favor with the prosecution in order to avoid a drug charge and its impact on his job. Through the testimony of

---

[39] Rec. Doc. 20, p. 21.

Detective Trippodo, the jury was already aware that Lee was "agitated" and "concerned" when he realized he might be charged in connection with the marijuana, was in fact initially charged with a marijuana offense, and was concerned that his job as a postal employee would be affected.[40]  More importantly, however, there is simply no evidence whatsoever that Lee was in fact in danger of being prosecuted at the time of trial.  On the contrary, Detective Trippodo testified that Lee's arrest had "turned out to be a mistake,"[41] and the state indicates that the criminal charge against Lee had been refused before petitioner was even indicted.[42]

Petitioner also argues that the defense could perhaps have used the references to marijuana use as a means to undermine the reliability of Lee's observations and memory of the events and his identification of petitioner as one of the perpetrators.  While that is a stronger argument, it still is not strong enough to warrant relief.   *If* the defense had been able to show that Lee was smoking marijuana at the time of the incident, the undersigned acknowledges that such a showing could possibly have lessened his credibility in the jurors' eyes and that *might* have affected the outcome of the trial.  However, "[t]he *mere possibility* that an item of undisclosed information ... *might* have affected the outcome of the trial ... does not establish 'materiality' in the constitutional sense."  United States v. Agurs, 427 U.S. 97, 109-110 (1976) (emphasis added).  Rather, as noted, a petitioner must show that there is a *reasonable probability* that it would have done so.  See, e.g., Strickler v. Greene, 527 U.S. 263, 291 (1999) ("The District Court was surely correct that there is

---

[40]  State Rec., Vol. III of IV, transcript of February 23, 2005, p. 23, 30, and 34.

[41]  State Rec., Vol. III of IV, transcript of February 23, 2005, p. 23.

[42]  Rec. Doc. 20, p. 22 n.24.

a reasonable *possibility* that either a total, or just a substantial, discount of [the witness's] testimony might have produced a different result, either at the guilt or sentencing phases. ...  As the District Court recognized, however, petitioner's burden is to establish a reasonable *probability* of a different result." (emphasis in original)).

Here, it simply cannot be said that the brief, vague references to marijuana use were sufficient to nudge petitioner past that threshold of *reasonable probability* of a different result.  Lee admitted at trial that marijuana was present in the "rec room,"[43] and Detective Trippodo testified that the room "had a very strong odor or marijuana."[44]  Therefore, the jurors already had a basis for inferring that Lee might have been smoking marijuana despite his protestations to the contrary.  Those considerations, along with the absence of any indication in the police report that Lee had actually been observed using – or admitted to using – marijuana, lead the undersigned to conclude that the brief, vague references in the police reports were insufficient to render the reports "material" in a constitutional sense.  Moreover, in any event, it must be noted that Detective Trippodo testified that Lee was coherent, did not appear to be "high," and did not smell of marijuana.[45]  Accordingly, even if petitioner had been able to present evidence showing that Lee had in fact smoked marijuana that day, petitioner has offered nothing to show that Lee was so impaired that a reasonable juror would have had cause to question the reliability of his testimony.

---

[43]  State Rec., Vol. III of IV, transcript of February 23, 2005, p. 118.

[44]  State Rec., Vol. III of IV, transcript of February 23, 2005, p. 21.

[45]  State Rec., Vol. III of IV, transcript of February 23, 2005, pp. 43-44 and 56.

In summary, while petitioner's <u>Brady</u> claim is not wholly frivolous, he simply has not shown that the state court decision denying his claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In fact, very few petitioners are able to make that showing and establish that relief is warranted under the AEDPA's stringently narrow standards of review. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

<u>Harrington v. Richter</u>, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); <u>see also</u> <u>Renico v. Lett</u>, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."). Here, even when the facts in this case are viewed in the light most favorable to petitioner, there clearly remains room for fairminded disagreement on petitioner's <u>Brady</u> claim. As a result, relief is precluded under the AEDPA.

<u>**RECOMMENDATION**</u>

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Wilton Carraby be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[46]

New Orleans, Louisiana, this thirteenth day of July, 2015.

_____
**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[46] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.